1   KAMALA D. HARRIS
    Attorney General of California
2   MICHAEL W. JORGENSON
    Supervising Deputy Attorney General
3   BRENDAN M. KENNY
    Deputy Attorney General
4   State Bar No. 237969
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
     Telephone:  (415) 703-5744
6    Fax:  (415) 703-5480
     E-mail:  Brendan.Kenny@doj.ca.gov
7   *Attorneys for Defendants Hedrick, Salazar, Sanudo,*
    *Powell, Machuca, Muniz, Machuca, and Solis*

8                   IN THE UNITED STATES DISTRICT COURT

9               FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                          SAN JOSE DIVISION

11

12

13   **KAHEAL PARRISH,**                    C 11-1438 LHK (PR)

14                          Plaintiff,      **DEFENDANTS' NOTICE OF MOTION
                                            AND MOTION FOR SUMMARY**
15              v.                          **JUDGMENT; MEMORANDUM OF
                                            POINTS AND AUTHORITIES**
16   **A. SOLIS, et al.,**

17                          Defendants.

18                                          [No hearing per May 23, 2011 order of
                                            service]
19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3    Introduction ........................................................................................................ 1

4    Statement of the Case ......................................................................................... 2

     Issues Presented .................................................................................................. 2

5    Statement of Undisputed Facts........................................................................... 2

6    Summary-Judgment Standard ........................................................................... 12

7    Argument .......................................................................................................... 12

8         I.    Parrish's excessive force claim fails because prison staff who removed
                Parrish acted reasonably, and their supervisors had no involvement in
                Parrish's removal. ......................................................................................... 12

9              A.    Excessive force requires serious force and a malicious and sadistic
10                   intent............................................................................................... 12

11             B.    Defendants Machuca, Powell, and Sanudo used reasonable force
                     because they followed Salinas Valley's suicide prevention and use-
                     of-force regulations. ...................................................................... 13

12                  1.    Because Parrish was a threat to himself, force was necessary
13                        to protect him. ..................................................................... 13

14                  2.    Defendants used the least-possible force. .................................... 14

                    3.    Parrish's injuries were minor. ..................................................... 15

15                  4.    Defendants reasonably perceived that Parrish was a threat to
16                        himself................................................................................. 15

                    5.    After Defendants ordered Parrish to leave his cell
17                        voluntarily, they used the least-possible force, and stopped
                          using force when they restrained Parrish. ..................................... 16

18             C.    Defendants Salazar, Muniz, Hedrick, and Solis are not liable
                     because they had no role in an alleged constitutional violation................ 17

19        II.   Defendants are entitled to qualified immunity because reasonable prison
20              officials would not think that they used excessive force................................. 18

21             A.    Qualified immunity protects good-willed and competent prison
                     officials............................................................................................ 18

22             A.    Reasonable prison officials in Defendants Machuca, Powell, and
                     Sanudo's positions would not have believed that they used
23                   excessive force by following Salinas Valley regulations........................ 19

     Conclusion ........................................................................................................ 19

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ................................................................................ 12

*Beard v. Banks*
548 U.S. 521 (2006) ................................................................................ 12

*Bibbs v. Singh*
C 09-2031 MPH, 2011 WL 1884336 (N.D. Cal. May 18, 2011) ........................................ 16

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ................................................................................ 12

*Clement v. Gomez*
298 F.3d 898 (9th Cir. 2002) ....................................................................... 12

*Close v. Pierce County, Washington*
2009 WL 3877598 (W.D. Wash. Nov. 18, 2009) ........................................................ 19

*Hart v. Celaya*
548 F. Supp.2d 789 (N.D. Cal. 2008) ............................................................ 16, 17

*Henderson v. City of Simi Valley*
305 F.3d 1052 (9th Cir. 2002) ...................................................................... 13

*Hudson v. McMillan*
503 U.S. 1 (1992) ................................................................................... 13

*Malley v. Briggs*
475 U.S. 335 (1986) ................................................................................ 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986) ................................................................................ 12

*Murphy v. Shelby*
C 07-02299 JF, 2009 WL 773499 (N.D .Cal. Mar. 23, 2009) ........................................... 16

*Norwood v. Vance*
591 F.3d 1062 (9th Cir. 2010) ...................................................................... 19

*Pearson v. Callahan*
129 S. Ct. 808 (2009) .............................................................................. 18

ii

1
2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3
4

*Saucier v. Katz*
   533 U.S. 194 (2001) ................................................................................ 18

5

*Scott v. Harris*
   550 U.S. 372 (2007) ........................................................................ 13, 14

6
7

*Taylor v. List*
   880 F.2d 1040 (9th Cir. 1989) ................................................................ 17

8
9

*Torres v. City of L.A.*
   548 F.3d 1197 (9th Cir. 2008) ................................................................ 17

10

*Whitley v. Albers*
   475 U.S. 312 (1986) ................................................................................ 12

11

**STATUTES**

12
13

California Code of Regulations, Title 15
   § 3044(a)(6)(A) ...................................................................................... 11

14

United States Code, Title 42
   § 1983 ...................................................................................................... 17
   § 1997e(c)(1) ............................................................................................ 2

15
16

Constitutional Provisions
   Eighth Amendment ........................................................................ 2, 12, 18

17

**COURT RULES**

18
19

Federal Rule of Civil Procedure
   Rule 56 ...................................................................................................... 1

20
21

   Rule 56(c) ............................................................................................... 12
   Rule56(e) ............................................................................................... 12

22
23
24
25
26
27
28

1   TO KAHEAL PARRISH, PRO SE:

2   PLEASE TAKE NOTICE that Defendants Hedrick, Salazar, Sanudo, Powell, Machuca,[1]

3   Muniz, Machuca, and Solis move this Court to dismiss this suit under Federal Rule of Civil

4   Procedure 56 because there are no genuine issues of material fact, they are entitled to judgment as

5   a matter of law, and they are entitled to qualified immunity.

6   This motion is based on this notice of motion and motion; the accompanying memorandum

7   of points and authorities; the declarations of Machuca, McCann, Muniz, Powell, Salazar, and

8   Solis; the administrative motion; and all pleadings, exhibits, and papers on file in this action; and

9   any other matters properly before the Court.

10   **INTRODUCTION**

11   Parrish has sued prison officials for using force to prevent him from committing suicide.

12   But if Defendants had not removed Parrish from his cell, they would likely be facing a failure-to-

13   protect suit from Parrish or a wrongful death suit from his family.

14   The Constitution does not require that prison officials be placed in such a lose/lose dilemma.

15   Prison officials use excessive force only if they maliciously and sadistically use force to harm an

16   inmate.  Parrish's allegations do not meet this high threshold.  In fact, he admits that he stated that

17   he was suicidal, and then acted on his suicidal feelings by covering his cell windows, turning off

18   his cell lights, swallowing metal, intending to die in the cell, and refusing to leave the cell for a

19   medical evaluation.

20   Defendants had no choice but to act as they did, and they may have saved Parrish's life.

21   Therefore, Parrish's allegations that Defendants removed him from his cell in retaliation for his

22   indecent exposure, and used force against him after he was restrained are insufficient to create a

23   triable issue of material fact.  And even if he could create a triable issue of material fact,

24   Defendants are entitled to qualified immunity because reasonable prison officials in their position

25   would have done the same thing.

26   ///

27   [1] There are two Machucas named as defendants.  Unless otherwise noted, Machuca is
28   Sergeant R. Machuca, Jr.

1

1

**STATEMENT OF THE CASE**

2       Parrish filed this suit on March 18, 2011.  (Docket No. 1.)  As required by 42 U.S.C. §

3   1997e(c)(1), this Court screened his complaint, and determined that Parrish stated a cognizable

4   Eighth Amendment claim that Defendants used excessive force when they removed him from his

5   cell.  (Order of Service, dated May 23, 2011, at 2:7–17.)  This Court ordered service on

6   Defendants.

7

**ISSUES PRESENTED**

8       1.      Parrish alleges that Defendants violated his Eighth Amendment rights by using

9   excessive force when they removed him from his cell.  Prison officials use excessive force if they

10  maliciously and sadistically use force to harm an inmate.  After Parrish covered his cell windows

11  and turned off his cell lights, said he was suicidal, said that he wanted to die and had swallowed

12  metal, refused to leave his cell, and stopped responding, Defendants removed Parrish from his

13  cell.  Must the Court grant Defendants' summary-judgment motion because their actions to

14  remove Parrish from his cell were reasonable and taken to ensure the safety and security of

15  Parrish and the prison?

16      2.      Prison officials are entitled to qualified immunity unless reasonable prison officials in

17  their position would have known that they violated a clearly established constitutional right.

18  Courts give prison officials wide discretion when using force to restore order.  Defendants

19  removed Parrish from his cell to protect him from harming himself, and they would likely have

20  been sued if they had not removed him.  Is qualified immunity appropriate because reasonable

21  prison officials in Defendants' position would not have known that they violated a clearly

22  established right?

23

**STATEMENT OF UNDISPUTED FACTS**

24

**BACKGROUND**

25      1.      Parrish is incarcerated at Salinas Valley State Prison.  (Compl.)  He has mental-health

26  difficulties, and is designated an Enhanced Outpatient Program (EOP) inmate.  (Compl. at 3.)

27

28

2

1

**INDECENT EXPOSURE**

2      2.     Salinas Valley has a policy of managing inmates who indecently expose themselves

3  or commit other sexual misconduct.  (Decl. Machuca Supp. Defs.' Mot. Summ. J. (Decl.

4  Machuca) ¶ 2.)  Prison officials place inmates housed in general-population units in

5  administrative segregation for exposing themselves.  (*Id.*)  Inmates observed exposing themselves

6  are issued a rules-violation report, and forfeit good-time credits if found guilty.  (*Id.*)  Prison

7  officials also respond to indecent exposure incidents by attempting to prevent further indecent

8  exposure incidents, including by placing a partial window covering over the offending inmate's

9  cell.  (*Id.*)  This limits the inmate's ability to be observed exposing himself.  (*Id.*; Decl. Powell

10  Supp. Defs.' Mot. Summ. J. (Decl. Powell) ¶ 2.)

11

**OPERATIONAL PROCEDURES**

12      3.     Salinas Valley's local institutional policies are set forth in Operational Procedures

13  (OPs).  (Decl. Solis Supp. Defs.' Mot. Summ. J. (Decl. Solis) ¶ 2.)  All OPs are approved and

14  implemented by the Warden.  (*Id.*)  No other prison administrators, including associate wardens

15  or captains, have the authority to implement OPs.  (*Id.*)  State-wide policies are approved and

16  implemented by CDCR's administrators at CDCR's headquarters in Sacramento.  (*Id.*)

17

**ADMINISTRATIVE SEGREGATION MENTAL HEALTH AND SUICIDE PREVENTION**

18      4.     Administrative segregation is designed for inmates who pose a threat to the safety and

19  security of the prison, or who require more secure housing than what is available in a general-

20  population unit.  (Decl. Machuca ¶ 3.)  Inmates housed in administrative segregation with special

21  mental-health needs are monitored by mental-health clinicians.  (*Id.*)  This includes EOP inmates;

22  inmates who have difficulty adjusting to living in the prison's general population, but who are not

23  so disabled that they require inpatient care.  (*Id.*)  Salinas Valley houses EOP inmates who require

24  administrative segregation in D facility.  (*Id.*)

25      5.     This administrative-segregation unit is specially designed to offer EOP inmates an

26  array of services to address their mental-health needs.  (*Id.* at ¶ 4.)  One of these services is the

27  daily clinical rounds conducted by a mental-health clinician to identify and attend to inmates'

28  mental needs.  (*Id.*)  Staff members are required to be alert for inmates who may intend to commit

3

suicide or do harm to themselves.  (Decl. Machuca ¶ 4; Decl. Muniz Supp. Defs.' Mot. Summ. J. (Decl. Muniz) ¶ 3, Ex. A at 1.)  If a staff member believes that an inmate has attempted to commit suicide or harm himself, or is in danger of committing suicide or harming himself, he must respond to prevent this from occurring.  (*Id.*; Decl. Muniz Ex. A at 1, 14.)  This includes the use of immediate force to prevent the inmate from harming himself.  (*Id.*)

### USE-OF-FORCE POLICY

6.     Custodial staff may use emergency force when an inmate poses an immediate threat to prison security or the safety of anyone.  (Decl. Machuca ¶ 5; Decl. Muniz ¶ 4, Ex. B at 1.)  This includes inmates attempting to commit suicide, threatening to commit suicide, attempting to harm themselves, or threatening to harm themselves. (*Id.*)

### INCIDENT PACKAGES

7.     Incident packages document prison events that may lead prison officials to issue a rules-violation report against one or more inmates.  (Decl. Salazar Supp. Defs.' Mot. Summ. J. (Decl. Salazar) ¶ 2; Decl. Muniz ¶ 5.)  Generally, the lieutenant for the housing unit where the incident occurred reviews the incident package and decides whether to approve it.  (*Id.*)  The lieutenant prepares CDCR 837-A and 837-B forms as part of an incident package.  (*Id.*)  These forms provide a summary of what happened in the incident.  (*Id.*)  They are usually based in part on the CDCR 837-C forms that are also part of the incident package.  (*Id.*)  The prison staff directly involved in the incident document what occurred on these forms.  (*Id.*)

8.     If the lieutenant approves the incident package, the lieutenant provides the package for the Warden's approval.  (Decl. Salazar ¶ 3; Decl. Muniz ¶ 6.)   Usually, a representative of the Warden reviews the package, such as the captain of the facility where the incident occurred.  (*Id.*)

### INMATE DISCIPLINE

9.     When prison officials suspect that an inmate committed serious misconduct, such as indecent exposure or obstructing a peace officer, prison officials may issue an inmate a rules-violation report.  (Decl. Muniz ¶ 8.)  The rules-violation report describes the inmate's misconduct.  (*Id.*)  The inmate then has the opportunity to defend himself from the charges at a

4

1   hearing conducted by a senior hearing officer.  (Decl. Muniz ¶ 8.)  The senior hearing officer's

2   decision is then reviewed by a captain, and then by the chief-disciplinary officer.  (*Id.*)

3                                                    **STAFF COMPLAINTS**

4         10.   Staff complaints are a way that Salinas Valley inmates may challenge the actions of

5   individual employees by requesting that the institution investigate an employee's actions.  (Decl.

6   Salazar ¶ 8.)  Staff complaints may be brought through the administrative-grievance process.

7   (*Id.*)

8         11.   Inmates bringing staff complaints though the grievance process must describe their

9   complaint when they first submit the appeal.  (Decl. Salazar ¶ 9.)  Like other inmate appeals, the

10  inmate is customarily interviewed.  (*Id.*)  There he has the opportunity to clarify his complaint.

11  Those investigating often interview the staff members accused of misconduct.  (*Id.*)  When doing

12  so, the investigator prepares a report documenting his findings and conclusions.  (*Id.*)

13                                          **PARRISH'S INDECENT EXPOSURE**

14        12.   On June 11, 2010, at approximately 10:00 a.m., inmate Kaheal Parrish was housed in

15  the administrative-segregation unit in Salinas Valley's D facility designated for inmates with

16  special mental-health needs.  (Decl. Machuca ¶ 6, Ex. A.)  He was an EOP inmate.  (*Id.*)   While a

17  mental-health clinician was at Parrish's cell front asking him questions about his mental health,

18  she saw that his left hand was inserted in the front of his boxers, and that he was stroking his

19  partially visible penis.  (*Id.*)  She told Parrish that she would report him, and noted that Parrish

20  had just recently had the partial window covering removed from his cell from the last indecent

21  exposure episode.  (*Id.*)   The social worker then informed Defendant Sergeant Machuca that she

22  observed Parrish masturbating.  (*Id.*)

23        13.   Parrish had been disciplined before for exposing himself to female staff.  (Decl.

24  Machuca ¶ 7.)   The last time he exposed himself, Machuca told him that a partial window

25  covering would be permanently placed over his cell to limit his ability to expose himself if he

26  exposed himself again.  Machuca did not threaten him in any way.  (*Id.*)

27        14.   Sergeant Machuca prepared an incident report documenting what had occurred, and

28  submitted it for Defendant Lieutenant Salazar's approval.  (*Id.* at ¶ 8.)

                                                          5

1

**PARRISH'S SUICIDE ATTEMPT**

2
3
4
5
6
7
8

15.    Then, at approximately 12:30 a.m., Defendant Officer Powell informed Machuca that Parrish had covered his cell windows, except for a small section in the lower right window of the cell door.  (Decl. Machuca ¶ 9, Ex. B; Decl. Powell Supp. Defs.' Mot. Summ. J. (Decl. Powell) ¶ 3, Ex. A.)  Machuca told Powell to continue to monitor the situation and inform him of any changes.  (*Id.*)   Ten minutes later, a psychiatric technician informed him that Parrish stated that he was feeling suicidal and wanted to kill himself, but refused to exit his cell for a mental-health evaluation.  (Decl. Machuca ¶ 9.)

9
10
11
12

16.    Fearing that Parrish would harm himself, Machuca entered Parrish's unit.  (Decl. Machuca ¶ 10, Ex. B)  When Machuca arrived there, Powell and he observed that Parrish had completely covered his windows and had turned off his cell light.  (*Id.*; Decl. Powell ¶¶ 4–5, Ex. A.)  Therefore, they could not see into the cell.  (*Id.*)

13
14
15
16
17

17.    Machuca ordered Parrish to uncover his windows and turn on his lights.  (*Id.*)  Parrish refused and stated:  "I'm feeling suicidal, I'm gonna kill myself.  I already swallowed some metal."  (*Id.*)   Machuca again ordered Parrish to uncover his windows and turn on his cell lights.  (*Id.*)  Parrish again ignored his orders and again stated: "I'm suicidal."  (*Id.*)   Machuca addressed Parrish again, but there was no response.  (*Id.*)

18

**PARRISH'S CELL REMOVAL**

19
20
21
22
23
24
25

18.    Because Machuca was concerned that Parrish would follow through on his threats to kill himself, he instructed Defendant Officers Chavez and Spaulding to come to Parrish's cell. Machuca then unlocked the cell's food/cuff port.  (Decl. Machuca ¶ 11.)  The food/cuff port is where the inmate is given food and where the inmate places his hands to be handcuffed before he exits the cell.  (Decl. Machuca ¶ 11.)   Opening the port poses a danger to officers when they cannot see in the cell because the inmate could throw projectiles, feces, or urine through the open port.  (*Id.*)

26
27
28

19.    Nevertheless, Machuca opened the port because it was the only way he could see into the cell without opening the cell door.  (*Id.*)   He instructed Powell to place a transparent shield over the port as soon as he opened it.  (*Id.*)   Machuca then shined a flashlight into the cell.  (*Id.*)

6

Machuca and Powell saw that Parrish had covered both bunks and most of the rest of a cell with a sheet.  (Decl. Machuca ¶ 11; Decl. Powell ¶ 7.)  Because they could not see Parrish, Machuca determined that he was on the other side of the sheet.  (*Id.*)  Machuca again addressed Parrish, but he did not respond.  (*Id.*)

20.    Machuca was concerned that if he did not use immediate force Parrish would harm himself.  (Decl. Machuca ¶ 12.)  With the officers available, Machuca formed a team for an emergency-cell extraction.  (*Id.*)  He asked  the control-booth officer to open the cell door from the control booth upstairs, Powell to lead the team entering the cell with a shield, Chavez to apply leg restraints, Officer Sanudo handcuff Parrish, and Defendant Officer Spaulding to protect Powell if necessary.  (*Id.*)

21.    When Powell entered the cell, Machuca shined light into the cell.  (Decl. Machuca ¶ 13, Ex. B.)  Machuca saw Parrish jump off the lower bunk where he was seated and rush towards Powell, hitting the shield with his left shoulder and hands.  (*Id.*)  Powell then forced Parrish to the ground.  (*Id.*; Decl. Powell ¶ 7, Ex. A.)  Although he was on the ground on his stomach, Parrish kicked his feet up and down and side to side to break free.  (*Id.*)

22.    Machuca ordered Parrish to stop fighting, but Parrish did not stop until Chavez applied the leg restraints and Sanudo handcuffed him.  (*Id.*)

23.    There was an accidental discharge of oleoresin capsicum pepper spray[2] during the removal, but Parrish was not directly sprayed.  (Decl. Machuca ¶ 13, Ex. B; Decl. Powell ¶ 7, Ex. A.)  Officers carry OC canisters as part of their gear, and these canisters sometimes accidentally discharge.  (*Id.*)  Given the small size of the cell, the officers would have been just as affected by the OC as Parrish.  (*Id.*)  For this reason, when officers use OC spray to subdue inmates for an emergency removal, they do so before entering the cell, so that the officers are not subject to the effects of OC spray.  (*Id.*)

24.    Machuca then assigned Powell and Sanudo to escort Parrish for a medical evaluation.  (Decl. Machuca ¶ 13, Ex. B; Decl. Powell ¶ 7, Ex. A.)

---

[2] This is often referred to as "OC."

7

25.   After Defendants removed Parrish, Machuca called Salazar and informed him of what had occurred.  (Decl. Machuca ¶ 15; Decl. Salazar ¶ 4.)  Lieutenant Salazar did not arrive at the unit until after Parrish's medical evaluation.  (*Id.*)  Machuca later learned that an x-ray of Parrish's stomach showed that he had swallowed metal, and that he transferred from D facility for further medical and psychological monitoring.  (Decl. Machuca ¶ 15, Ex. B.)

26.   As required by Salinas Valley's use-of-force and suicide prevention policies, Sergeant Machuca addressed the serious danger Parrish posed to himself by removing Parrish from his cell.  (Decl. Machuca ¶ 12; Decl. Salazar ¶ 5; *See* Decl. Muniz Ex. A at 1, 14 & Ex. B at 1.)  Because this was an emergency action, Salazar did not authorize Parrish's removal, and therefore was not directly involved in the incident.  (Decl. Salazar ¶ 5.)

27.   That same day, Salazar reviewed the CDCR 837-B 837-C reports prepared by the staff directly involved in the incident, and he also prepared a CDCR 837-A report summarizing the incident.  (*Id.* at ¶ 6.)  He approved the incident package because the reports indicated that prison officials acted appropriately.  (*Id.*)  He then provided the package to Defendant Muniz, facility D's captain, who also approved it.  (Decl. Muniz ¶ 7, Ex. C.)

28.   None of the Defendants[3] threatened Parrish, retaliated against him, struck or kicked him, or used racial slurs or epithets when removing him from his cell.  (Decl. Machuca ¶ 16; Decl. Powell ¶ 10.)  No one denied Parrish medical care, told others to deny him medical care, or told anyone not to report Parrish's injuries.  (*Id.*; Decl. Salazar ¶7.)  And Defendant Officer A. Machuca was not present at any time during the removal.  (Decl. Machuca ¶16; Decl. Powell¶ 10.)

### PARRISH'S RULES-VIOLATION REPORTS

29.   On September 20, 2010, as part of his duties as D facility's captain, Defendant Muniz reviewed and approved two rules-violation reports concerning inmate Kaheal Parrish.  (Decl. Muniz ¶ 9–11, Exs. D–E.)  The first was for indecently exposing himself to a mental-health worker on June 11, 2010, and the second was for obstructing peace officers later that day when he

---

[3] Of the Defendants, only Machuca, Powell, and Sanudo were involved in removing Parrish from his cell.

was removed from his cell.  (Decl. Muniz ¶ 9–11, Exs. D–E.)  Parrish was found guilty of indecent exposure because he did not refute the evidence that he exposed himself, and he was found guilty of obstructing peace officers because he admitted that he covered up his windows before Machuca had him removed from his cell.  (*Id.*)

### PARRISH'S STAFF COMPLAINT

30.     On August 23, 2010, Parrish submitted a staff complaint challenging his removal from his cell on June 11, 2010.  (Compl. Ex. D.)  He admitted that he was suicidal, told staff that he was suicidal, had swallowed metal, and wanted to die in his cell.  (*Id.* at p. 2 of attachment.)  And he admitted that he covered his cell windows, turned off his cell light, and refused to exit his cell after Machuca's repeated requests that he do so.  (*Id.*)  He submitted the staff complaint late because he was not mentally competent to submit it earlier.  (*Id.* at p. 1 of attachment.)  He alleged that he was harmed after he was already restrained, and that he was pepper sprayed in the face, eye, anus, and testicles.  (*Id.*)  He also alleged that staff retaliated against him by removing him from the cell because Machuca threatened him about an indecent exposure incident a few weeks earlier, and he exposed himself the day he was removed from his cell.  (Compl. Ex. D at p. 2 of attachment.)  Parrish did not allege that staff used racial slurs or threatened to harm him physically.  (*Id.*)

31.     On October 7, 2010, Salazar conducted an investigation concerning Parrish's allegations that staff members used excessive force when they removed him from his cell after he stated he was suicidal, stated that he had swallowed a piece of metal, stated that he wanted to die in his cell, and refused to leave his cell.  (Decl. Salazar ¶ 11, Ex. A.)[4]  Because Salazar was not directly involved in Parrish's removal from his cell, it was appropriate that he conduct this investigation.  (*Id.*)  And in any event, Parrish cooperated fully with the investigation and never objected to Salazar performing it. (*Id.*)

32.     Parrish's staff complaint and Salazar's report indicate that Parrish did not allege that Machuca or anyone else threatened him on June 11, 2010, used racial epithets, or that A.

---

[4] Exhibit A to Salazar's declaration has been submitted under seal, and is included with Defendants' administrative motion, which they concurrently filed.

9

Machuca was involved in the cell removal.  (Compl. Ex. D; Decl. Salazar ¶ 11, Ex. A.)  He admitted that he was suicidal and refused to exit his cell when ordered, but did not state that he refused to leave for fear of being beaten.  Parrish did not address any alleged wrongdoing by Defendants Solis, Muniz, or Salazar, and he also did not identify any injuries he suffered during the cell removal.  (*Id.*)

33.   Based on her review of the confidential supplement prepared by Salazar and other information, Defendant Solis determined that prison staff acted appropriately by removing Parrish from his cell, and did not violate CDCR policy.  (Decl. Solis ¶ 3.)

**PARRISH'S COMPLAINT**

34.   Parrish alleges that Defendants are part of a "green wall prison gang" that fosters a code of silence to cover-up wrong doing against inmates.  (Compl. at 3(a).)  He alleges that Machuca told him in May 2010, after Parrish had been charged with indecent exposure, that if he was charged with indecent exposure again, he would "feel the green wall," and that Powell had boasted of the green wall several times.  (*Id.* at 3(b).)

35.   After Parrish was charged with indecent exposure on June 11, he alleges that Powell came to his cell told him he had "an ass kicking coming."  (Compl. at 3(b).)  Parrish then became fearful and suicidal, and he reported to the psychiatric technician that he was suicidal.  (*Id.* at 3(c).)  Powell returned with Machuca and ordered Parrish to submit to handcuffing.  (*Id.*)  Parrish admits that he refused to submit to handcuffing but alleges that he did so because he was afraid.  (*Id.*)  Then Powell came into the cell and pushed him onto the ground, while other officers placed Parrish into handcuffs and leg restraints.  (*Id.* at 3(d).)

36.   Parrish alleges that Machuca then spoke to his brother A. Machuca in Spanish while he pepper sprayed Parrish's anus, testicles, and face, while they and Sanudo both kicked Parrish, and while Powell hit Parrish.  (*Id.* at 3(d)–3(e).)  Then the Machucas left the cell and were replaced by Spaulding, Chavez and someone named Reyes.  (*Id.* at 3(e).)  Powell then pushed Parrish's face into the cell floor, cutting his lower lip.  (*Id.*)

37.   Parrish alleges that he was then escorted to a holding cell for a medical evaluation and Machuca (based on Salazar's orders) instructed the medical examiner to only record injuries

10

1    where pepper spray was discharged, and denied Parrish's request for decontamination.  (Compl.

2    at 3(e)–3(f).)

3        38.    Parrish alleges that Defendants falsified the incident package by falsely stating that

4    Parrish charged Powell with clenched fists and that Parrish's injuries were caused by an

5    accidental discharge of OC spray.  (*Id.* at 3(f).)

6        39.    Parrish alleges that he suffered burning skin, eyes and lungs, bruised legs and torso, a

7    swollen cut lip, pain in the back of his head and migraine headaches.  (*Id.* at 3(g.) He also

8    complains that Salazar should not have investigated his staff complaint because he was involved

9    in the cell removal.  (*Id.* at 3(g)–3(h).)

10                **PARRISH'S MEDICAL RECORDS FROM JUNE 2010 TO DECEMBER 2010**

11        40.    Parrish's allegations of injury, that he suffered burning skin, eyes and lungs, bruised

12    legs and torso, a swollen cut lip, pain in the back of his head and migraine headaches are

13    contradicted by his medical records.  When Parrish was transferred from D facility for treatment

14    on June 11, none of his medical providers noted the injuries he now alleges.  (Decl. McCann Ex.

15    A at AGO 0001–0022.)

16        41.    At the time, Parrish stated to his health provider that "everything was OK in ASU[5] up

17    until today, at which time he 'simply woke up feeling suicidal.'"  (Decl. McCann at AGO 0005.)

18    On June 18, Parrish reported no abdominal back pain.  (*Id.* at AGO 0013.)

19        42.    On June 22, he complained of low back pain and pain in his right leg, but reported

20    that it began a few months earlier.  (*Id.* at AGO 0014.)  On June 28, he complained of back pain,

21    this was noted on July 14, and beginning on July 27 he received physical therapy for pain in his

22    back and right leg.  (*Id.* at AGO 0021.)  No other pain or injuries were noted.

23        43.    For the first and only time, Parrish alleged on November 2, 2010, that he had

24    migraine headaches caused by the force used during his cell removal.  (*Id.* at AGO 0048.)  But on

25    November 20, he stated that his migraine headaches were caused by being outside in bright light.

26    (*Id.* at AGO 0058.)

27    _____

   [5] ASU is an acronym for an administrative-segregation unit.  See, e.g., Cal. Code Regs. tit.
28   15, § 3044(a)(6)(A) ("Administrative Segregation Unit (ASU).")

                                          11

1

### SUMMARY-JUDGMENT STANDARD

2     Summary judgment is appropriate "where there is no genuine issue as to any material fact,

3  and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A court must

4  enter summary judgment if the non-moving party "fails to make a showing sufficient to establish

5  the existence of an element essential to that party's case, and on which that party will bear the

6  burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  There is no triable

7  issue of fact unless there is enough evidence for a jury to return a verdict for the non-moving

8  party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

9     Once a defendant meets the initial burden of providing a basis for summary judgment, and

10  identifies evidence demonstrating no genuine issue of material fact, the plaintiff must establish a

11  genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

12  574, 586 (1986).  A plaintiff may not rely solely on his pleadings, but must provide specific facts

13  in admissible evidence. Fed. R. Civ. P. 56(e); *Matsushita,* 475 U.S. at 586 n.11.  Although

14  normally the court draws all justifiable inferences in the non-moving party's favor, the court must

15  give deference to the prison officials' views in disputed matters of professional judgment.  *Beard*

16  *v. Banks*, 548 U.S. 521, 522 (2006).

17

### ARGUMENT

18  **I.    PARRISH'S EXCESSIVE FORCE CLAIM FAILS BECAUSE PRISON STAFF WHO**
19  **REMOVED PARRISH ACTED REASONABLY, AND THEIR SUPERVISORS HAD NO**
    **INVOLVEMENT IN PARRISH'S REMOVAL.**

20     **A.    Excessive Force Requires Serious Force and a Malicious and Sadistic**
           **Intent.**
21

22     Prison officials violate the Eighth Amendment if they use excessive force against inmates.

23  *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002).  When responding to a disturbance, they

24  use excessive force only if they maliciously and sadistically use serious force against an inmate in

25  order to cause harm.  *Id.* at 904.  Prison officials have a wide range of options to "maintain or

26  restore discipline," including deadly force.  *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986).

27     The following factors indicate whether a prison official used excessive force:

28     •    Need for force;

12

1          • Relationship between the force used and the force needed;

2          • Extent of inmate's injury;

3          • Threat reasonably perceived by responsible officers; and

4          • Efforts to temper the severity of the force.

5     *Hudson v. McMillan*, 503 U.S. 1, 7 (1992).

6          Where evidence of excessive force is "woefully sparse," the plaintiff fails to raise a dispute

7     of fact regarding an excessive force claim.  *Henderson v. City of Simi Valley*, 305 F.3d 1052,

8     1061 (9th Cir. 2002).  And "[w]hen opposing parties tell two different stories, one of which is

9     blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

10    adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v.*

11    *Harris*, 550 U.S. 372, 380–83 (2007).

12          **B.    Defendants Machuca, Powell, and Sanudo Used Reasonable Force Because**
               **They Followed Salinas Valley's Suicide Prevention and Use-of-Force**
13             **Regulations.**

14          Parrish alleges that Defendants removed him from his cell because he again

15    indecently exposed himself and used excessive force when removing him.  But Defendants

16    removed Parrish from his cell to protect him.

17          Parrish covered up his cell windows and turned off the cell lights, said he was suicidal, said

18    that he wanted to die and had swallowed metal, refused to leave his cell, and stopped responding

19    to Machuca's commands.  (Decl. Machuca ¶¶ 9–12, Ex. B; Decl. Powell ¶¶ 3–6.)  Only then did

20    Defendants Machuca, Powell, and Sanudo remove Parrish from his cell.  Salinas Valley's suicide-

21    prevention and use-of-force policies authorized the use of force in these circumstances.  (Decl.

22    Machuca ¶¶ 12–13, Ex. B; Decl. Powell ¶¶ 7.)

23               **1.    Because Parrish was a threat to himself, force was necessary to**
                      **protect him.**
24

25          Defendants used force to remove Parrish from his cell because, as described in greater

26    detail above, his actions required this.  By covering up his cell windows and turning off his cell

27    lights he prevented Defendants from seeing into his cell.  (Decl. Machuca ¶10.)  And he covered

28    up most of his windows and said that he was suicidal to the psychiatric technician and Powell.

                                        13

1   (Decl. Machuca ¶ 9; Decl. Powell ¶ 3.)  By the time Machuca came to Parrish's cell, he had

2   completely covered his windows and turned off his cell lights, again said he was suicidal, said

3   that he wanted to die in his cell and had already swallowed metal.  (*Id.* at ¶ 10, Ex. B; Decl.

4   Powell ¶¶ 5–6, Ex. A.)  Even when Machuca looked into the cell with a light, he could not see

5   Parrish, and because Machuca could not see Parrish, he had to protect Parrish from harming

6   himself.  (*See* Decl. Machuca ¶ 13, Ex. B.)

7   **2.    Defendants used the least-possible force.**

8   Defendants restored order with the least-possible force.  Parrish was determined not to

9   leave his cell, and he acknowledges that he would not leave his cell.  Salinas Valley's suicide

10   prevention policy required that Defendants act, and the use-of-force policy authorized the use of

11   immediate force precisely in these circumstances.  (Decl. Salazar ¶ 5.)

12   Parrish alleges that several officers beat him and sprayed him with OC spray after he was

13   already restrained (Compl. at 3(d)–3(f)), but his allegations blatantly contradict the factual record.

14   *See Scott*, 550 U.S. at 380–83.

15   According to Parrish, Powell and another officer handcuffed him and placed him in leg

16   restraints.  (Compl. at 3(d).)  Then, according to Parrish, Machuca spoke to his brother in Spanish

17   while spraying Parrish with OC spray—even though the OC spray would have affected the

18   officers in the cell too—and shouted at him while he and two other officers kicked him; all while

19   Powell was on Parrish's back with a four to five foot plastic shield while he hit him in the back of

20   the head and shouted racial epithets.  (*Id.* at 3(d)–3(e).)  Next, according to Parrish, Machuca and

21   his brother left the cell, and Spaulding and Chavez entered to escort him out.  (*Id.*)  Finally,

22   Powell pushed Parrish into the cell floor and left the cell.  (*Id.*)

23   Parrish's account is completely at variance with all the evidence.  Parrish's medical records

24   show no complaints of injury other than exposure to OC spray until November, and even then,

25   Parrish contradicted himself.  (*See* Decl. McCann at AGO 0001–0022, 0048, 0058.)  And as the

26   photographs of the administrative-segregation cell attached to Machuca's declaration show, there

27   was insufficient room in Parrish's cell for a total of eight different officers to be kicking, hitting,

28   talking to each other, and spraying OC spray.  (*See* Decl. Machuca Ex. B.)  Because Parrish's

14

1   account "blatantly contradicts" the records and reason, Defendants' summary-judgment motion

2   must be granted.

3           **3.**      **Parrish's injuries were minor.**

4         Defendants never kicked or struck Parrish during his removal from his cell and never

5   intentionally used OC spray.  (Decl. Machuca ¶16; Decl. Powell ¶ 10.)    And they did nothing to

6   interfere with Parrish's medical evaluation after the cell removal.  (Decl. Machuca ¶16; Decl.

7   Powell ¶ 10; Decl. Salazar ¶7.)  The only injuries noted on the medical evaluation were some pain

8   in Parrish's left eye from exposure to OC spray.  (Decl. Muniz Ex. C at "Medical Report of

9   Injury".)  Then, in the staff complaint he submitted more than two months later, he alleged that he

10  had pain in his body, his head, and his face, eye, anus, and testicles.  (Compl. Ex. D at p. 1 of

11  attachment.)  And then, in his complaint filed in March 2011, he alleged that he "suffered burning

12  skin, eyes, and lungs, swollen eyes, painful and bruised legs and torso, swollen cut lip, pained

13  back head and extensive migraine headaches."  (Compl. at 3(g).)  However, his medical records

14  from June 2010 to December 2010 show no complaints of such injuries.  (Decl. McCann Ex. A at

15  AGO 0001–0058.)

16        Parrish's injuries consisted of some pain in his left eye from exposure to OC spray and

17  possibly from when he rushed into Powell as Powell entered his cell.  (*Compare* Decl. Muniz Ex.

18  A at "Medical Report of Injury" *with* Decl. Powell ¶ 7 (Parrish "hit the shield with the left side of

19  his face . . .")  Because these injuries were minor —as shown by the extensive medical care

20  Parrish following his transfer from D facility, where he had every opportunity to complain of

21  injuries—and Defendants never interfered with Parrish's medical treatment, they did not

22  maliciously or sadistically harm Parrish.

23          **4.**      **Defendants reasonably perceived that Parrish was a threat to himself.**

24        Defendants Machuca, Powell, and Sanudo believed that Parrish was a threat to himself.

25  Their belief was reasonable because Parrish said he wanted to kill himself, prevented staff from

26  monitoring his safety, and swallowed metal.  (Decl. Machuca ¶¶ 9–11, Ex. B; Decl. Powell ¶¶ 3–

27  6, Ex. A.)  Salinas Valley's suicide prevention policy required that Defendants take these actions

28  seriously, and Salinas Valley's use-of-force policy authorizes the use of immediate force in these

15

1  circumstances.  (Decl. Muniz Ex. A at 1, 14 & Ex. B at 1; Decl. Salazar ¶ 5.)  Because reasonable

2  officers would understand that an inmate who threatened to commit suicide and then took actions

3  to commit suicide was a danger to himself, Defendants reasonably perceived that Parrish was a

4  danger to himself.

5          **5.    After Defendants ordered Parrish to leave his cell voluntarily, they
                used the least-possible force, and stopped using force when they
6                restrained Parrish.**

7          Defendants Machuca, Powell, and Sanudo tried to convince Parrish to leave his cell

8  voluntarily.  After their efforts failed, they used the least-possible force to handcuff and restrain

9  him.  (Decl. Machuca ¶¶ 9–13, 16; Decl. Powell ¶¶ 3–7, 10.)  Then they stopped using force as

10  soon as Parrish stopped resisting.  (*Id.*)  Courts have granted prison officials' summary-judgment

11  motions in similar circumstances.  *See Bibbs v. Singh*, C 09-2031 MPH, 2011 WL 1884336, at

12  *6–7 (N.D. Cal. May 18, 2011); *Murphy v. Shelby*, C 07-02299 JF, 2009 WL 773499, at *5–6

13  (N.D .Cal. Mar. 23, 2009); *Hart v. Celaya*, 548 F. Supp.2d 789, 802–805 (N.D. Cal. 2008).

14          In *Bibbs*, the district court granted the summary-judgment motion of officers who grabbed

15  an inmate, forced him to the ground, and then applied handcuffs and leg restraints after the inmate

16  lunged at them and refused to submit to handcuffs.  2011 WL 1884336, at *1, 6–7.  The court

17  granted summary judgment in the officers' favor because the inmate posed a threat, the officers

18  attempted to get the inmate to comply without force, the force was reasonable, and the inmate had

19  no serious damages.  2011 WL 1884336, at *1, 6–7.

20          In *Murphy*, the district court granted the summary-judgment motion of officers who used

21  force to remove an inmate from his cell after he fought with a cellmate.  2009 WL 773499, at *5–

22  6.  The inmate alleged that the officers told his cellmate to attack him, and, although he was

23  willing to exit his cell, sprayed him with an entire can of OC spray, slammed him against the wall,

24  and threw him down a flight of stairs.  *Id.*  The district court granted summary judgment because

25  the inmate's injuries were minor and he provided inadequate evidence to overcome the officers'

26  assertions that none of this occurred.  *Id.*

27          In *Hart*, the district court granted the summary-judgment motion of officers who used OC

28  spray in response to an inmate's refusal of orders to undergo a body search and his banging on his

16

cell door.  *Hart*, 548 F. Supp.2d 789, 802–805.  The inmate alleged that the officers sprayed him

without provocation, forced him to touch his genitals with OC-saturated hands, twisted his wrist

and pushed him into a holding cell, and forced him to kneel in the asphalt for an hour in the hot

sun.  *Id.* at 802.  The district court granted summary judgment because the inmate's injuries were

minor and he disobeyed orders.  *Id.* at 802–805.

Because Defendants Machuca, Powell, and Sanudo used force only after their orders that

Parrish exit the cell went unheeded and they had to take action to protect Parrish, and then only

used the least-possible force, they acted in good faith.

### C.   Defendants Salazar, Muniz, Hedrick, and Solis Are Not Liable Because They Had No Role in an Alleged Constitutional Violation.

Parrish alleges that Salazar, Muniz, Hedrick, and Solis are liable for his alleged injuries

because they endorsed Parrish's cell removal and implemented (unspecified) faulty regulations.

But these allegations do not state a 42 U.S.C. § 1983 claim.

To establish section 1983 liability, Parrish must demonstrate that Defendants Salazar,

Muniz, and Solis were personally involvement in the alleged violation.  *See Torres v. City of L.A.*,

548 F.3d 1197, 1206 (9th Cir. 2008).  He must specifically show how each of them through his or

her own individual actions, violated Plaintiff's constitutional right.  *See Taylor v. List*, 880 F.2d

1040, 1045 (9th Cir. 1989).  Parrish has not met this burden.

Salazar was the D facility lieutenant, but he not informed of Parrish's behavior until after

Parrish had been cell and medically evaluated.  (Decl. Salazar ¶¶ 4–7.)  Then Salazar approved

the incident package documenting Parrish's cell removal.  (*Id.*)  Salazar never interfered with

Parrish's medical care.  (*Id.*)

Muniz was the D facility captain, and he approved the incident package documenting

Parrish's cell removal.  (Decl. Muniz 7.)  He also approved the senior hearing officer's guilty

findings on Parrish's rules-violation reports for exposing himself and obstructing peace officers.

(*Id.* at ¶¶ 8–11.)

Solis was the Chief Deputy Warden, and she approved the response to Parrish's staff

complaint regarding his cell removal.  (Decl. Solis ¶¶ 2–3.)

17

Salazar, Muniz, Hedrick, and Solis had no role in approving or implementing Salinas Valley or CDCR regulations.  (Decl. Solis ¶ 2; Decl. Muniz ¶2.)  Salinas Valley regulations are approved by the Warden, and state-wide CDCR regulations are approved at CDCR's Sacramento headquarters.  (*Id.*)

Because the supervisory defendants had no role in Parrish's cell removal, this Court must grant summary judgment in their favor.

**II.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE REASONABLE PRISON OFFICIALS WOULD NOT THINK THAT THEY USED EXCESSIVE FORCE.**

**A.    Qualified Immunity Protects Good-Willed and Competent Prison Officials.**

Defendants are also entitled to qualified immunity because reasonable prison officials in their position could have believed that they had acted lawfully by removing a suicidal inmate from his cell.

Qualified immunity shields all but incompetent and ill-willed prison officials from liability. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  In *Saucier*, the Supreme Court explained the qualified-immunity analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, the court decided whether the alleged facts show that the official's conduct violated a constitutional right, taken in the light most favorable to the party asserting a constitutional violation. *Id*.  If there was no constitutional violation, the official was entitled to qualified immunity. *Id*.  If a constitutional right was violated, then the court determined whether the right was clearly established, and whether a reasonable officer would have understood that he was violating that right. *Id*. at 201–02.

The Supreme Court has since held that the *Saucier* analysis is no longer mandatory. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).  The Supreme Court acknowledged cases where there may be a constitutional right, but it is plainly not clearly established. *Id*.  The Supreme Court explained that litigation wastes the parties' resources. *Id*.  Therefore, before addressing the constitutional issue, the Court may determine if an inmate has a clearly-established Eighth Amendment right to be free from being removed from his cell after threatening to kill himself, preventing officers from monitoring him, and refusing to leave for a medical evaluation.

18

1

2

**A.      Reasonable Prison Officials in Defendants Machuca, Powell, and Sanudo's Positions Would Not Have Believed That They Used Excessive Force by Following Salinas Valley Regulations.**

3

Parrish faults Machuca, Powell, and Sanudo for entering his cell because Parrish was

4

suicidal, swallowed metal, said he wanted to die in his cell, covered up his cell, turned off his cell

5

lights, and refused to come out because he was afraid of being beaten.  But even if they used

6

excessive force by removing him under these circumstances, reasonable prison officials would

7

not have thought so.

8

Salinas Valley's suicide prevention policy requires staff to take efforts to protect an inmate

9

if he has harmed himself, or has threatened to harm himself.  (Decl. Machuca ¶4; Decl. Muniz ¶ 3

10

Ex. A at 1, 14.)  Salinas Valley's use-of-force policy authorizes the immediate use of force in this

11

situation.  (Decl. Salazar ¶ 5.)

12

And if Defendants adopted Parrish's scheme for addressing suicidal inmates, they would

13

likely be sued for failing to protect potentially inmates.  *See, e.g, Close v. Pierce County,*

14

*Washington,* 2009 WL 3877598, at *4–5 (W.D. Wash. Nov. 18, 2009). They had a duty not only

15

to use reasonable force against inmates, but also must meet their other legal obligations.  *See*

16

*Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010) (prison officials must balance duty to

17

protect inmates with other obligations, such as providing outdoor exercise).  In *Close*, the district

18

court denied prison officials' summary-judgment motion because a triable issue of fact existed as

19

to whether the officers were deliberately indifferent to an inmate's risk of committing suicide

20

when they allegedly failed to properly monitor him.  2009 WL 3877598, at *4–5

21

Because Defendants behaved reasonably by refusing to ignore the clear threat that Parrish

22

posed to himself, they are entitled to qualified immunity.

23

**CONCLUSION**

24

Parrish said he was suicidal and wanted to die in his cell.  He then took suicidal action by

25

swallowing metal, preventing officers from observing him, and ignoring commands to exit his

26

cell for a medical evaluation.  Defendants Machuca, Powell, and Sanudo acted reasonably by

27

using the least-possible force to remove Parrish from his cell and protect him from himself.  In

28

19

1  fact, they would likely have been sued if they had not removed him.  And Parrish's allegations

2  that they used excessive force not only blatantly contradict the record, they contradict reason.

3      Defendants Salazar, Muniz, Hedrick and Solis are entitled to summary judgment because

4  there were not involved in Parrish's removal from his cell, and they were not responsible for

5  approving Salinas Valley's regulations.

6      And even if Defendants used excessive force, they are entitled to qualified immunity

7  because reasonable prison officials would not have believed that they violated a clearly

8  established constitutional right.

9
10  Dated:  December 5, 2011                              Respectfully Submitted,

11                                                       KAMALA D. HARRIS
                                                         Attorney General of California
12                                                       MICHAEL W. JORGENSON
                                                         Supervising Deputy Attorney General

13

14

15                                                       */s/ Brendan M. Kenny*
                                                         BRENDAN M. KENNY
16                                                       Deputy Attorney General
                                                         *Attorneys for Defendants Hedrick, Salazar,*
17                                                       *Sanudo, Powell, Machuca, Muniz, Machuca,*
                                                         *and Solis*
18  SF2011201829
    40492520.docx
19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name:   **K. Parrish v. A. Solis, et al.**        No.   **C 11-1438 LHK**

I hereby certify that on **December 5, 2011**, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**

**DECLARATION OF R. MACHUCA, JR. IN SUPPORT OF DEFENDANTS' SUMMARY-JUDGMENT MOTION**

**DECLARATION OF C. MCCANN IN SUPPORT OF DEFENDANTS' SUMMARY-JUDGMENT MOTION**

**DECLARATION OF W. MUNIZ IN SUPPORT OF DEFENDANTS' SUMMARY-JUDGMENT MOTION**

**DECLARATION OF B. POWELL IN SUPPORT OF DEFENDANTS' SUMMARY-JUDGMENT MOTION**

**DECLARATION OF G. SALAZAR IN SUPPORT OF DEFENDANTS' SUMMARY-JUDGMENT MOTION**

**DECLARATION OF A. SOLIS IN SUPPORT OF DEFENDANTS' SUMMARY-JUDGMENT MOTION**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

I further certify that some of the participants in the case are not registered CM/ECF users. On **December 5, 2011**, I have caused to be mailed in the Office of the Attorney General's internal mail system, the foregoing document(s) by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days to the following non-CM/ECF participants:

**Kaheal Parrish, F-15901 - Salinas Valley State Prison**
**P.O. Box 1050, Soledad, CA  93960-1050**
*Pro Se*

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **December 5, 2011**, at San Francisco, California.

| M. Thai | /s/ M. Thai |
|---------|-------------|
| Declarant | Signature |

40492710.doc